PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

JOHN E. LANE, III, Executor, Estate
of Beverly W. Powell,
*Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA,
*Defendant-Appellee.*

No. 01-2161

JOHN E. LANE, III, Executor, Estate
of Beverly W. Powell,
*Plaintiff-Appellee,*

v.

UNITED STATES OF AMERICA,
*Defendant-Appellant.*

No. 01-2180

Appeals from the United States District Court
for the Western District of Virginia, at Lynchburg.
Norman K. Moon, District Judge.
(CA-00-4-6)

Argued: February 25, 2002

Decided: April 17, 2002

Before WILKINSON, Chief Judge, MICHAEL, Circuit Judge,
and Raymond A. JACKSON, United States District Judge
for the Eastern District of Virginia, sitting by designation.

_____

Affirmed in part, reversed in part, and remanded by published opin-
ion. Chief Judge Wilkinson wrote the opinion, in which Judge
Michael and Judge Jackson joined.

**COUNSEL**

**ARGUED:** Joel Bron Miller, WOOTEN & HART, P.C., Roanoke, Virginia, for Appellant. Steven Wesley Parks, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Eileen J. O'Connor, Assistant Attorney General, John L. Brownlee, United States Attorney, Bruce R. Ellisen, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

**OPINION**

WILKINSON, Chief Judge:

John Lane, as executor of the estate of Beverly Powell, filed suit seeking a refund of federal gift taxes allegedly overpaid by Mrs. Powell for tax year 1994. The United States brought a counterclaim seeking to recover allegedly erroneous income tax refunds issued for tax years 1992 and 1993. The parties dispute whether $798,250 in payments made between 1988 and 1993 by Mrs. Powell's late husband, Hampton Powell, to his friend and former secretary, Jane Young, were gifts or compensation for services. The district court concluded that they were gifts and dismissed the complaint. It also held that the counterclaim was time-barred under 26 U.S.C. § 6532(b) because the government failed to prove that Lane made intentional or knowing misrepresentations in connection with the amended income tax returns he filed.

Lane appeals, and the United States cross-appeals. Because the payments in question were gifts, and because Lane's grossly negligent misrepresentations were sufficient to trigger the extended limitations period of § 6532(b), we affirm in part, reverse in part, and remand with instructions to enter judgment in favor of the United States on its counterclaim.

I.

What follows is a story of sentiment which appellant would convert

into a tale of greed. We therefore relate in some detail the district court's findings following a bench trial.*

A.

Hampton Powell was formerly CEO of the Lane Company, a furniture manufacturer based in Altavista, Virginia. Jane Young was his secretary there from 1958 until he retired in 1984. Young handled Mr. Powell's personal and financial affairs. Because Mr. Powell had a lifelong distrust of attorneys and accountants, he refused to seek their advice regarding tax and estate planning. Instead, he relied exclusively upon Young to prepare his and his wife's tax returns. Young studied tax materials and passed a tax course exam.

Mr. Powell was a very generous man. Indeed, giving was his primary pleasure in life. Before 1988, he made annual transfers of Lane Co. stock to churches, charities, family members, and Young each Christmas. The Powells also made substantial cash gifts to charity from 1983 through 1993. His practice at Christmas was to give shares of stock in equal amounts to Young, Mrs. Powell, and his sister. He also gave Young myriad gifts of clothing, jewelry, perfume, candy, collectibles, and housewares during the year.

Mr. Powell amassed great wealth during his career, primarily in the form of Lane Co. stock, which was converted to Interco stock when Interco acquired Lane Co. in the mid-1980s. Due to concerns over Interco's prospects, Young persuaded Mr. Powell to sell his stock at the last minute before a deadline, which he had been reluctant to do because of his long association with Lane Co. When Interco subsequently went into bankruptcy, he was very grateful to her.

The Powells had no children, and Mr. Powell viewed Young almost as a daughter. He took a fatherly interest in her life, and in her son and two grandsons. Young viewed Mr. Powell as a father and the best friend she ever had. She promised him that she would look after

---

*Lane contests many of these findings. As discussed below, however, we conclude from our review of the record that the district court did not commit clear error in making them. *See Comm'r v. Duberstein*, 363 U.S. 278, 289-91 (1960).

Mrs. Powell when he died. Young continued to help him with his finances after he retired in 1984, as she did with her own aged family members. She never expected to be paid, and told him so.

After retiring from Lane Co. in March 1989, Young continued to help Mr. Powell with his personal finances until his death in June 1994. She devoted no more than two hours per week on average to his finances. They never negotiated any exchange of money for her services. During the last five years of his life, she visited him whenever he was in the hospital, and she went to the Powell home every month or two to discuss their finances and socialize.

Mr. Powell made gifts totaling $798,250 to Young from 1988 to 1993 — the Contested Payments in this case. All of the payments were made pursuant to Letters of Authorization, which stated that they were gifts. He called each of the six year-end payments her annual Christmas gift.

As part of the Contested Payments, Mr. Powell gave Young gifts of Conrail stock and $100,000 in spring 1989. Beyond his usual generosity, he was concerned about her future welfare in light of her widowhood and recent retirement, and he was grateful to her for persuading him to sell his Interco stock. His gratitude was also one motivating reason for the first Contested Payment.

Mr. Powell filed federal gift tax returns for tax years 1988-1993, reporting his payments to Young as gifts. Mrs. Powell signed each of these returns. Because Mrs. Powell viewed the payments as gifts from Mr. Powell, she did not report them on her income tax returns.

Mr. Powell made the Contested Payments solely from his assets. He always consulted Mrs. Powell beforehand, however, and she did not object. Thanks to Mr. Powell, Young was financially secure and did not need to work by 1988. She nonetheless continued to help Mr. Powell out of gratitude for all he had done for her. When he asked whether he owed her anything for preparing one of his returns, she replied that he owed her nothing due to his generosity over the years. Though she received no payment in 1994, she never considered filing a claim against his estate.

The only understanding Young ever had was that Mr. Powell made the payments out of love and affection. She thought that he never would have paid anyone $100,000 a year or more for any services, and that he plainly could distinguish a paycheck from a gift.

B.

After Mr. Powell died in June 1994, Mrs. Powell engaged John Lane to advise her regarding the administration of Mr. Powell's estate and her own financial planning. Lane had an accountant examine the tax implications of recharacterizing the Contested Payments as compensation to Young. Lane advised Mrs. Powell to amend her 1989-1993 gift tax returns and claim that the payments in those years were compensation. But because of her declining health, as well as her late husband's view of them as gifts, she declined.

When Mrs. Powell died in July 1995, Lane became the executor of her estate, and began to investigate the propriety of the Contested Payments. He accused Young of self-dealing and breach of fiduciary duty. These accusations were an attempt to get Young to defend the payments by showing what she had done to deserve them, thereby twisting her words into an admission that she had "earned" them. But Young repeatedly insisted that the payments were gifts, and Lane uncovered no evidence of any attempt by her to deceive Mr. Powell.

In July 1996, Lane filed amended gift tax returns on behalf of the late Mrs. Powell for tax years 1989-1994. The 1994 return stated a refund claim for $136,920. The returns were premised on the recharacterization of the Contested Payments as compensation. When the IRS denied the claim in the 1994 return, Lane filed suit.

In August 1996, Lane filed amended income tax returns (Forms 1040X) for 1992 and 1993 on behalf of the late Powells. They too sought to recast the Contested Payments as compensation. They claimed that a significant portion of the alleged compensation paid to Young was deductible from the Powells' taxable income. The IRS thereafter paid $21,794.46 in refunds to Mrs. Powell's estate.

In signing the 1992-93 Forms 1040X, Lane was aware of no document establishing an employment or contractual relationship — or

even an informal arrangement — between Mr. Powell and Young, pursuant to which he paid her in exchange for services. Lane knew of no oral statement by Mr. Powell that he made the payments to compensate her. Lane had no personal knowledge of her efforts.

Lane made false representations of material fact on the 1992-1993 income tax refund claims. Attachment 1040X-1, a three-page narrative explanation setting forth the alleged factual and legal bases for the refunds sought, fails to relate the crucial fact that Mr. Powell viewed the Contested Payments as gifts and so characterized them on his 1988-1993 gift tax returns. It cites authorities governing the taxation of employer-employee property transfers, possibly implying that Young was his employee. And it states that she concedes the nature of her services, but it reproduces only fragments of her words which conflict with her simultaneously expressed belief that the payments were gifts.

It can reasonably be inferred that Lane intended for the IRS to issue the requested income tax refunds in reliance upon the explanation attached to each return, and that Lane wanted to convey that the value of Young's help from 1988 through 1993 was equal in value to the Contested Payments. Had the returns disclosed that those payments were reported as gifts on Mr. Powell's original 1992-1993 gift tax returns, or that the alleged "compensation" forming the basis for the refund claims far exceeded any reasonable valuation of Young's services, the IRS would have inquired further.

## C.

In view of these facts, the district court found that Mr. Powell's "dominant reason" for making the Contested Payments was the "affection, respect, admiration, charity or like impulses" he felt toward Young. That is, he was motivated by "a detached and disinterested generosity." *Comm'r v. Duberstein*, 363 U.S. 278, 285-86 (1960) (internal quotations omitted). It held that Lane had failed to prove that the payments were compensation, and thus failed to prove that a gift tax refund was due.

The court also concluded that the government's counterclaim to recover allegedly erroneous income tax refunds for 1992 and 1993

was time-barred. Section 6532(b)'s two-year statute of limitations period had passed. And the court held that its five-year limitations period was unavailable because the United States had not proven that Lane's false statements on Attachment 1040X-1 were intentional or knowing misrepresentations of material fact. In the court's view, Lane made only legal characterizations of the payments as compensation, not patent misrepresentations.

The court thus dismissed the complaint and the counterclaim. Lane appeals, and the United States cross-appeals. The parties primarily dispute whether the Contested Payments were gifts or compensation. If the Contested Payments were compensation, then Mrs. Powell paid too much in gift taxes during her lifetime, and her estate is entitled to a refund. Lane's 1994 amended gift tax return stated a refund claim for $136,920. Also at stake is the validity of Lane's amended 1992-1993 income tax returns filed on behalf of the late Powells. If the Contested Payments were compensation, then a portion of them was deductible from the Powells' taxable income. The IRS paid $21,794.46 in income tax refunds to Mrs. Powell's estate, and the Service now seeks to recover that money as erroneously refunded.

II.

A.

We review under the clearly erroneous standard the district court's factual determination that Mr. Powell's dominant reason for making the Contested Payments to Young was the affection he felt toward her. *See Duberstein*, 363 U.S. at 289-91; *Poyner v. Comm'r*, 301 F.2d 287, 289 (4th Cir. 1962). This standard also applies "to factual inferences from undisputed basic facts, . . . as will on many occasions be presented in this area." *Duberstein*, 363 U.S. at 291; *see also Poyner*, 301 F.2d at 289. By contrast, once Mr. Powell's dominant motive has been determined, we review *de novo* the legal question of whether the payments were gifts or income, as those terms are used in the Internal Revenue Code. *Poyner*, 301 F.2d at 289-90.

B.

Section 102(a) of the Internal Revenue Code excludes from a taxpayer's gross income "the value of property acquired by gift." In

*Duberstein*, the Supreme Court observed that the term "gift" in § 102 is used in a "colloquial sense," not "in the common-law sense," and it declined to establish a bright-line test for distinguishing gifts from compensation payments under the Code. 363 U.S. at 284-85. Instead, the Court stated that the gift-compensation determination "must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case." *Id.* at 289. *See also Poyner*, 301 F.2d at 289. The Court emphasized that

> [t]he nontechnical nature of the statutory standard, the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, confirm us in our conclusion that primary weight in this area must be given to the conclusions of the trier of fact.

*Duberstein*, 363 U.S. at 289. Thus, a payee's having performed contemporaneous services for the payor might be significant to the gift-compensation determination, but it is just one of "the totality of the facts" that must be considered. *Duberstein*, 363 U.S. at 289.

When the payment "proceeds from a detached and disinterested generosity, . . . out of affection, respect, admiration, charity or like impulses" toward the payee, it is a gift for federal tax purposes. *Id.* at 285 (internal quotations omitted). The Court stressed that "the most critical consideration . . . is the transferor's 'intention.'" *Id.* at 285-86 (quoting *Bogardus v. Comm'r*, 302 U.S. 34, 43 (1937)). Thus, in making the gift-compensation determination, "the proper criterion . . . is one that inquires what the basic reason for [the payor's] conduct was in fact—the dominant reason that explains his action in making the transfer." *Id.* at 286.

The district court properly applied *Duberstein* in concluding that the Contested Payments were gifts, not compensation. It was far from clearly erroneous for the court to find that Mr. Powell's "dominant reason" for making the payments was the "affection, respect, admiration, charity or like impulses" he felt toward Young. *Duberstein*, 363

U.S. at 285-86. Indeed, a plethora of facts support the court's determination.

First, Mr. Powell was a generous person in general, and he felt fatherly affection for Young in particular. Indeed, he expressed and acted on the basis of sincere concerns about her future welfare. In addition, he had a longstanding practice of periodically making substantial gifts to Young in addition to other members of his family. Moreover, he made clear, contemporaneous expressions of intention — both oral and written — that the Contested Payments were gifts. And perhaps most significant of all, he subsequently filed gift tax returns, reporting the payments as gifts. All of these facts support the district court's determination that Mr. Powell's "dominant reason" for making the Contested Payments was the "affection, respect, admiration, charity or like impulses" he felt toward Young. *Id.* That, in turn, compels the legal conclusion that the Contested Payments were gifts. *See Poyner*, 301 F.2d at 289-90.

It is true, of course, that "the donor's characterization of his action is not determinative." *Duberstein*, 363 U.S. at 286. Rather, "there must be an objective inquiry as to whether what is called a gift amounts to it in reality." *Id.* The district court in this case made just such an inquiry. And though the Court in *Duberstein* stated that "the parties' expectations or hopes as to the tax treatment of their conduct in themselves have nothing to do with the matter," *id.*, here Mr. Powell characterized the payments as gifts to his own financial detriment. Under these circumstances, his view of them is one significant factor that evidences his intention in making the payments to Young. Indeed, Lane is not able to cite a single case in which a court has held that payments in contention were compensation where the payor submitted gift tax forms.

It is also true that Mr. Powell was profoundly grateful to Young for her timely advice in connection with the Interco stock sale, and that his gratitude to her for that advice was one motivating factor behind the first Contested Payment. Further, the payments were contemporaneous with much of the help she gave him. But these considerations do not by themselves suffice to show that the "dominant reason" for the payments was compensatory in nature where, as here, the facts point overwhelmingly in the opposite direction. If something looks

like a duck, walks like a duck, and talks like a duck, and the district court determines it to be a duck, it is not our place on review to call it something else. Accordingly, the district court correctly held that the Contested Payments were not compensation, and thus that no refund was due the Estate for gift taxes overpaid.

Throughout these proceedings, Lane has insinuated that Young was motivated by how much she stood to gain from the characterization of the Contested Payments as gifts and not compensation. It is certainly the case that, insofar as the payments were viewed by the IRS as gifts, the Powells would have to pay the resultant gift taxes, and Young would not have to pay any income taxes. But Lane has not produced any evidence that Young coerced or manipulated Mr. Powell into characterizing the payments as gifts. And in view of their quasi-familial personal relationship, there is strong evidence that Young never had any desire to manipulate Mr. Powell even if she could have. Nor do we see how she could have duped him even if she had wanted to do so. As a wealthy businessman, Mr. Powell was far from unsophisticated concerning his financial affairs. The district court determined that Mr. Powell freely characterized the payments to Young as gifts because that is exactly how he thought of them.

### III.

The United States filed a counterclaim against Lane under 26 U.S.C. § 7405 to recover allegedly erroneous income tax refunds granted to him from the 1992-1993 tax years. Section 7405 states that any suit for the recovery of an erroneous refund is subject to the limitations periods set forth in § 6532(b), which provides:

> Recovery of an erroneous refund by suit under section 7405 shall be allowed only if such suit is begun within 2 years after the making of such refund, except that such suit may be brought at any time within 5 years from the making of the refund if it appears that any part of the refund was induced by fraud or misrepresentation of a material fact.

§ 6532(b). The district court's holding that § 6532(b)'s five-year limitations period applies only to intentional or knowing misrepresentations of material fact concerns a pure question of statutory

interpretation. We therefore review it *de novo*. *See United States v. Segers*, 271 F.3d 181, 183 (4th Cir. 2001).

The two-year limitations period had already lapsed by the time the United States sought to state its counterclaim. Thus, the government may move forward only if it can take advantage of the five-year period by showing that Lane induced the IRS to pay the refund "by fraud or misrepresentation of a material fact." Because the United States has not alleged that Lane committed fraud in requesting the refunds, the issue before us is whether the government may recover on the basis of a "misrepresentation" by him. The answer to this question depends upon how that statutory term is construed — in particular, what *mens rea*, if any, it requires.

Lane argues, and the district court agreed, that § 6532(b) contemplates only intentional or knowing representations because the word "misrepresentation" implies an intent to deceive or mislead. Lane claims that the government has failed to show any intentional or knowing act. In addition, Lane submits that the United States has not demonstrated any objective falsity. Rather, at most the government has identified an honest disagreement as to whether the Contested Payments were compensation or gifts. Lane asserts that this is a legal question or, at a maximum, a mixed question of law and fact. It is not a "fact" that can be determined to be empirically true or false.

The United States, by contrast, maintains that § 6532(b)'s extended limitations period is not limited to intentional or knowing misrepresentations. Rather, by its terms the section provides a five-year limitations period for instituting erroneous refund actions where there has been a "misrepresentation" of material fact, not an intentional or knowing misrepresentation. The United States submits that the word "misrepresentation" includes negligent and even innocent misrepresentations. In addition, the government claims that Lane's amended income tax returns "indisputably contained numerous misrepresentations of material facts that were at least negligent," and which were critical to whether he was entitled to the refunds he sought on behalf of Mrs. Powell's estate.

We need not accept either position for purposes of deciding this case. To begin with, Lane's view is clearly wrong. The five-year stat-

ute of limitations applies under circumstances of either "fraud or misrepresentation." And by definition, fraud requires an intentional or knowing misrepresentation. *See Black's Law Dictionary* 670-71 (7th ed. 1999). Thus, to construe the word "misrepresentation" as limited to intentional or knowing misrepresentations would render that statutory term superfluous. This would ignore the basic principle of statutory interpretation instructing courts to "avoid a reading which renders some words altogether redundant." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995). *See also United States v. Neustadt*, 366 U.S. 696, 702 (1961) (holding that 28 U.S.C. § 2680(h) "applies to both 'misrepresentation' and 'deceit,' and, as 'deceit' means fraudulent misrepresentation, 'misrepresentation' must have been meant to include negligent misrepresentation, since otherwise the word 'misrepresentation' would be duplicative") (internal quotations omitted). Where possible, we must give effect to every term in the statute. Lane's construction of § 6532(b) needlessly fails to do so.

In rejecting Lane's view, we align ourselves with most of the courts that have interpreted the term "misrepresentation" in § 6532(b). *See, e.g.*, *Black Prince Distillery, Inc. v. United States*, 586 F. Supp. 1169, 1174 (D. N.J. 1984) (stating that "[s]ection 6532(b) does not require willfulness" and suggesting that the five-year limitations period could be triggered "by a grossly negligent misrepresentation"); *Merlin v. Sanders*, 144 F. Supp. 541, 543 (N.D. Ga. 1956) (holding that a "[w]ilful misrepresentation is not required"), *aff'd*, 243 F.2d 821 (5th Cir. 1957). *But see United States v. Northern Trust Co.*, 93 F. Supp. 2d 903, 908-910 (N.D. Ill. 2000) (requiring that the misrepresentation be intentional or knowing). The district court in the case at bar erred in following *Northern Trust*. That decision improperly relied in large part on cases interpreting the meaning of the term "misrepresentation" in statutory provisions dealing with the circumstances in which settlement agreements and closing agreements are binding on the parties. 93 F. Supp. 2d at 908-909. But such agreements are negotiated and executed jointly by the parties for the purpose of ending an existing controversy. The meaning of the term "misrepresentation" in that setting in no way governs its meaning in the very different context of § 6532(b), which places temporal limits on the government's ability to recoup erroneous refunds.

The government's proposed interpretation of § 6532(b) goes too far in the opposite direction. It would afford the United States the benefit

of a five-year limitations period for bringing actions to recover erroneous refunds even where the "misrepresentation" that led to the refund is wholly innocent. The government is certainly correct that § 6532(b), like all statutes of limitations that run against the United States, must be strictly construed in its favor. *See, e.g.*, *Badaracco v. Comm'r*, 464 U.S. 386, 391-92 (1984); *E.I. DuPont de Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924); *Levin v. Comm'r*, 986 F.2d 91, 93 n.12 (4th Cir. 1993). But if Congress had intended to include honest mistakes within the five-year purview, it most likely would have used the term "misstatement" in the statute, not "misrepresentation." The latter is typically employed to suggest some degree of culpability on the part of the actor. *See Black's Law Dictionary* 1016 (7th ed. 1999).

In any event, the factual misrepresentations here were neither innocent nor even negligent. Rather, they were grossly negligent at best and almost certainly reckless. Among Lane's other misrepresentations on his income tax refund claims, the district court specifically found that, in characterizing the Contested Payments as compensation, Attachment 1040X-1 did not include the critical fact that Mr. Powell thought of the payments as gifts and so characterized them on his 1988-1993 gift tax returns. Lane thus did not indicate that the decedent submitted gift tax forms. Neglecting to inform the IRS of such a salient fact bearing on the validity of his refund claims cannot be innocent or merely negligent.

Lane relies on language in *Northern Trust*, 93 F. Supp. 2d at 907, and *United States v. Indianapolis Athletic Club, Inc.*, 785 F. Supp. 1336, 1338 (S.D. Ind. 1991), in arguing that the government has not demonstrated any objective falsity, but rather has merely identified a disagreement over a legal question or a mixed question of law and fact. But the court in *Northern Trust* explicitly stated that the situation with which it was dealing was distinguishable from cases such as *Duberstein*, which "highlighted the need for a fact-based determination unimpeded by inexact verbal formulations." 93 F. Supp. 2d at 907. The district court erred in concluding that Lane made only legal characterizations of the Contested Payments as compensation, not patent misrepresentations. His claims and omissions in support of that conclusion amounted to critical misrepresentations of material fact.

Lane's misrepresentations were grossly negligent at a minimum. And in view of our conclusion that the statutory term "misrepresentation" in § 6532(b) lies somewhere in between the words "misstatement" and "fraud" on a scale of increasing culpability, we hold that the United States need not demonstrate more than gross negligence in order to avail itself of § 6532(b)'s five-year limitations period. We therefore must reverse the district court's dismissal of the government's counterclaim.

It follows from our resolution of the gift-compensation question that the IRS paid the 1992-1993 income tax refunds to Lane in error because his refund claims rested on the mistaken premise that the Contested Payments in those years were not gifts but deductible compensation. Accordingly, we remand the case to the district court with instructions to enter judgment in favor of the United States on its counterclaim.

### IV.

It is a popular misconception that tax disputes are technical to the exclusion of all else. This case shows otherwise. Not every relationship in life may properly be characterized as involving "a mercenary exchange of good offices according to an agreed valuation." Adam Smith, *The Theory of Moral Sentiments* pt. II, § II, ch. III, ¶ 2 (1759). Not every human interaction is animated by a desire to secure an advantage, obtain compensation for services, or receive a *quid pro quo*. The district court found that Mr. Powell's relationship with Jane Young was much deeper than that. It is reassuring that the law does not permit appellant to tarnish the memory of their friendship by retroactively undoing the kindness they exhibited toward each other over many years.

For the foregoing reasons, the judgment of the district court is affirmed in part, reversed in part, and remanded with instructions to enter judgment in favor of the United States on its counterclaim.

*AFFIRMED IN PART, REVERSED IN PART,*
*AND REMANDED*