Rehearing granted, April 21, 2005 regarding attorneys' fees & costs only
Remanded to district court for a new determination on the issue of fees by court order dated April 21, 2005
Reversed by Supreme Court, November 30, 2004

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

BRADLEY NIGH,

        *Plaintiff-Appellee,*

     v.

KOONS BUICK PONTIAC GMC,
INCORPORATED,

        *Defendant-Appellant,*

     and

HOUSEHOLD AUTOMOTIVE FINANCE
CORPORATION,

        *Defendant.*

No. 01-2201

---

BRADLEY NIGH,

        *Plaintiff-Appellant,*

     v.

KOONS BUICK PONTIAC GMC,
INCORPORATED; HOUSEHOLD
AUTOMOTIVE FINANCE CORPORATION,

        *Defendants-Appellees.*

No. 01-2224

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(CA-00-1634-A)

Argued: October 28, 2002

Decided: February 4, 2003

Before LUTTIG, WILLIAMS, and GREGORY, Circuit Judges.

Affirmed by published opinion. Judge Luttig wrote the opinion for the court. Judge Williams wrote an opinion concurring in part and concurring in the judgment in part. Judge Gregory wrote an opinion concurring in part and dissenting in part.

---

## COUNSEL

**ARGUED:** Arthur Mark Schwartzstein, ARTHUR M. SCHWARTZSTEIN, P.C., McLean, Virginia, for Appellant. A. Hugo Blankingship, III, BLANKINGSHIP & ASSOCIATES, P.C., Alexandria, Virginia, for Appellee. **ON BRIEF:** Jack D. Lapidus, MACLEAY, LYNCH, GREGG & LYNCH, P.C., Washington, D.C., for Appellant. Thomas Bryan Christiano, BLANKINGSHIP & ASSOCIATES, P.C., Alexandria, Virginia, for Appellee.

---

## OPINION

LUTTIG, Circuit Judge:

Bradley Nigh sued Koons Buick Pontiac GMC, Inc. (Koons Buick) for claims under the Truth In Lending Act (TILA), the Federal Odometer Act (FOA), and the Virginia Consumer Protection Act (VCPA), along with numerous claims sounding in contract, fraud, and conversion, all in connection with his purchase from Koons Buick of a used 1997 Chevrolet Blazer. Koons Buick filed a counterclaim for breach of contract and fraudulent and negligent misrepresentation. At summary judgment, the district court granted judgment on several claims and all the counterclaims. Some of Nigh's TILA, FOA, and VCPA claims survived for a jury trial and resulted in a verdict finding Koons Buick liable for $24,192.80 under TILA, and for $4,000.00 under the VCPA. Koons Buick appeals from the jury's verdict, as well as from several of the court's orders. Nigh, in a cross-appeal, also challenges several of the court's orders. Finding no error in the verdict or the court's rulings, we affirm the judgment below.

I.

This case arose from Koons Buick's sale of a truck to Bradley Nigh. The sale was not a simple cash-for-product exchange, but

involved a somewhat tortured effort by Koons Buick to provide Nigh consumer financing. Nigh first went to Koons Buick on February 4, 2000. While there, he decided to trade in his prior vehicle and buy the Blazer. To complete the sale, he executed a Buyer's Order, reflecting the proposed purchase, and a "Retail Installment Sales Contract" (RISC I), reflecting the proposed financing. The Buyer's Order and RISC I both reflected that Nigh would pay $4,000 down, and trade in his prior vehicle. Nigh received no price reduction for his trade-in because he estimated its remaining loan balance to equal the price Koons Buick gave him for it, but he also agreed to pay off any excess balance over the estimate. Nigh, having signed the contracts and turned them over to Koons Buick, was committed to the transaction and obliged to perform upon counter-signature by Koons Buick. Koons Buick did not counter-sign the documents as Nigh signed them, but intended to sign only once a lender agreed to buy an assignment of the installment payments owed under RISC I. The transaction's closing and the completion of Nigh's purchase were thus left within the dealership's unilateral control.

Nigh left the dealership in the Blazer, on the authority of a temporary certificate of ownership issued under Va. Code § 46.2-1542. Nigh left his trade-in vehicle behind, in anticipation that a lender would purchase assignment of the payments owed under RISC I and the transaction would close. Koons Buick, however, was unable to find a willing lender. Consequently, it restructured the deal to require an additional $2,000 down payment. The dealership represented this change to Nigh as a "better deal" at a lower rate, necessitating a new RISC (RISC II). Nigh returned to the dealership on February 25 based on this representation, but told Koons Buick he did not have an additional $2,000. He asked to return the new truck, retrieve his trade-in vehicle, and walk away from the deal. Koons Buick, however, told him he could not withdraw because it had sold his trade-in. Nigh, unaware of this statement's falsity, and at a loss, signed RISC II and a $2,000 Promissory Note to cover the added down payment.

Koons Buick, again unable to find a willing lender, called Nigh back. Nigh alleged the dealership told him, via a message left with his brother, that he had to come back to sign a new RISC (RISC III) or it would report the Blazer as stolen. Afraid of arrest, Nigh returned to the dealership on March 5, and under protest, signed RISC III with

a back-date of February 25. Koons Buick later closed the transaction by executing the contract documents and selling assignment of RISC III's installment payments to Household Automotive Finance Corporation (HAFC).

Afterwards, Nigh learned that his trade-in vehicle had been repossessed from the Koons Buick lot by its note-holder because Nigh, believing the vehicle to have earlier become property of Koons Buick, failed to make required payments. Nigh also learned that one of the reasons Koons Buick had been unable to get a lender to accept RISC II was that it contained an unaccounted for charge, later determined to be for a product whose sale to Nigh had not been properly documented, which Nigh did not recall seeing on the transaction documents, and which he never requested, agreed to accept, or received. The product, a Silencer car alarm, was listed on the second Buyer's Order and on RISC II at a price of $965. But absent from the transaction documents was a Silencer "we owe" form, which is used in retail car sales to document the sale of "after market" products in financed transactions. Disgruntled by the whole affair, Nigh made no payments on the truck and returned it to Koons Buick with a letter asserting a right to rescission. HAFC repossessed the truck from the dealership's lot because Nigh made no payments.

Nigh, claiming that Koons Buick defrauded him, brought this action under the statutory authority of TILA, FOA, and the VCPA, and under the common law. Koons Buick counterclaimed for breach of contract. The district court granted summary judgment to Koons Buick on its counterclaims and on many of Nigh's claims, but preserved for trial limited claims under TILA, FOA, and the VCPA. At trial, Nigh prevailed on his TILA claim that Koons Buick intentionally included the charge for the Silencer on RISC II without a basis for the charge, and on his VCPA claim that Koons Buick violated the VCPA by telling him that he did not have valid possession of the Blazer in order to induce him to sign RISC III. The court issued a Supplemented and Final Judgment on August 15, 2001, three months after trial, to clarify its summary judgment ruling on Koons Buick's counterclaims. This order is the proceeding's final judgment, from which appeal is now had.

## II.

As a preliminary jurisdictional matter, Nigh contends that Koons Buick did not timely file a notice of appeal. His objection was already addressed by a motions panel of this court, and denied for lack of merit. The district court filed a Supplemented and Final Judgment on August 15, 2001, and it is against this date that the notice of appeal's timeliness must be measured, irrespective of the fact that the court had earlier filed a Final Judgment and had set a subsequent date at which point notice of appeals tolling would end. Assessed in light of the August 15, 2001, order, Koons Buick's notice was timely.

## III.

The parties raise a variety of claims on appeal, none of which merit reversing the district court's conclusions of law or the fact-finder's determinations, but which we address in turn, beginning first with Koons Buick's claims.

## A.

Koons Buick attacks the district court's denial of summary judgment on Nigh's claim that RISC II constituted a TILA violation on several grounds. First, Koons Buick argues that because RISC II was never counter-signed, it is an unfunded financing agreement and cannot form the basis for TILA liability. Under what is commonly known as Regulation Z, creditors operating under 15 U.S.C. § 1638(b)(1), which governs this transaction, must "make [TILA] disclosures *before consummation* of the transaction," 12 C.F.R. § 226.17(b) (emphasis added); *cf.* 15 U.S.C. § 1638(b)(1) ("disclosures . . . shall be made *before the credit is extended*" (emphasis added)). TILA liability, however, cannot accrue *until* a credit transaction is consummated, or put another way, "until credit is in fact extended," *Baxter* v. *Sparks Oldsmobile, Inc.*, 579 F.2d 863 (4th Cir. 1978) (holding that a signed buyer's order that contemplated an installment sales contract did not constitute an extension of credit and so no TILA violation occurred), since until credit is extended to a person in a particular transaction there are no credit terms against which to assess a disclosure's accuracy. The pertinent legal question then is what consummation of a credit transaction, or extension of credit, encompasses.

Regulation Z defines consummation as the "time that a *consumer* becomes contractually obligated on a credit transaction." 12 C.F.R. § 226.2 (emphasis added). Under this regulation, a number of courts have held that consummation, or extension of credit, can encompass unfunded financing agreements. *See*, *e.g.*, *Johnson* v. *Steven Sims Subaru, Inc.*, 1993 WL 761231 (N.D. Ill. 1993); *Bryson* v. *Bank of New York*, 584 F. Supp. 1306 (S.D.N.Y. 1984); *Madewell* v. *Marietta Dodge, Inc.*, 506 F. Supp. 286 (N.D. Ga. 1980); *Copley* v. *Rona Enterprises, Inc.*, 423 F. Supp. 979 (S.D. Ohio 1976); *see also Dryden* v. *Lou Budke's Arrow Finance Co.*, 630 F.2d 641 (8th Cir. 1980) (holding that an unenforceable transaction was an extension of credit). We agree with this rule because the regulation expressly refers *solely* to the consumer's commitment and because TILA's express purpose of protecting consumers from receiving inadequate disclosures prior to *their* entering into credit transactions could not otherwise be effectuated. If consummation, or extension of credit, does not encompass a consumer's commitment to a financing agreement that provides unilateral power for the creditor to execute the agreement later, creditors could intentionally provide faulty disclosures to consumers, obtain their commitment, and then afterwards provide accurate disclosures prior to closing the transaction, which if provided earlier might have dissuaded the consumer from accepting the credit, all without incurring TILA liability. As the *Bryson* court noted:

> [T]he point at which the consumer . . . commits himself or herself to the purchase of credit, without regard for the degree of commitment of the lender . . . [is the point at which] the consumer becomes vulnerable to actual damage from the lender's inadequate or deceptive disclosures, for at this time he or she can be contractually bound to the terms of the lending contract at the option of the lender.

*Bryson*, 584 F. Supp. at 1317 (emphasis added). Consequently, we conclude that consummation, or extension of credit, under § 1638 encompasses unfunded, financing agreement options to which consumers contractually commit, and under which they can be bound at the lender's sole discretion. Here, Nigh's signing of RISC II and his giving over of the signed documents to Koons Buick worked his commitment and constituted consummation, or an extension of credit. Thus, the district court properly concluded that liability attached

"when Nigh made the choice and committed himself to the purchase of credit," *Nigh* v. *Koons Buick Pontiac GMC, Inc.*, 143 F. Supp. 2d 535, 549 (E.D. Va. 2001).

Koons Buick next attacks its TILA liability by arguing that, since the second Buyer's Order Nigh signed has a line-item listing the Silencer product for a price of $965, RISC II's disclosures were accurate, and thus do not violate TILA. But, for several reasons this claim also fails. First, the dealership conceded from the outset of this action that the $965 charge was a mistake and thus, by necessary implication, that RISC II was inaccurate. *See* Field Affidavit, J.A. at 252 (owner and president of Koons Buick admitting that "[p]laintiff should not have been charged for a silencer" and explaining that as a result "a third [RISC] was prepared"); *see also* Defendant's Responses to Plaintiff's First Set of Requests for Admissions, J.A. at 817 ("Admit that a charge of $965.00 was included on the second Buyer's Order for a "silencer." *Admitted that the charge was included in error*." (emphasis added)). Indeed, it was on the basis of these admissions that Koons Buick argued on summary judgment that it was due judgment under the affirmative defense of 15 U.S.C. § 1640(c), a bona fide *error* defense available to creditors who show that their TILA error was not intentional, but was a good faith mistake.[1] Koons Buick also argued on these admissions of error that if § 1640(c) did not apply, then § 1640(b) did, which provides an affirmative defense for lenders who have timely made corrections to their TILA *errors*.[2] Having conceded by affidavit, admission, and legal argument that the Silencer line-item was in error, Koons Buick cannot now contend that it was not in error and thus that RISC II was accurate.

Second, Koons Buick waived the legal argument that the congruence between the Buyer's Order and RISC II proves that RISC II accurately disclosed the transaction by virtue of the fact that it makes the argument for the first time here in the Court of Appeals. Though Koons Buick asserts in its briefs that it raised this legal objection ear-

---

[1]The jury ultimately rejected this defense, finding that Koons Buick "*intentionally* includ[ed]" the Silencer charge.

[2]The district court correctly rejected this defense because Koons Buick never notified Nigh of the error.

lier in the proceedings, its assertion is unsupported by the record. The citation to which Koons Buick directs the court records its argument at the start of trial, and *after* the summary judgment proceedings were concluded. *See* J.A. at 317-20. And though that trial exchange contains Koons Buick's assertion that RISC II accurately disclosed the transaction by virtue of its congruence with the second Buyer's Order, it noted this objection *only in furtherance of its argument that the error in RISC II was an innocent error*:

> When a mistake was discovered in the buyer's order agreement, there was a new retail installment contract which changed the APR and lowered the APR. That's the kind of mathematical error, assuming this was a TILA violation to start with that the correction of errors was designed to address.
>
> . . . .
>
> So, to the extent to which it's a TILA violation— and I'm not quite even [sure] it's a TILA violation because the first — [RISC II] was accurate as to the deal that both parties mistakenly agreed to. And certainly, Mr. Nigh having signed it, is not in a position to later come back and say he was unfairly taken advantage of.
>
> *So, your Honor, we believe that in ruling that we're not entitled to the [§ 1640(b)] defense for correction of errors, that the Court is incorrect.*

(J.A. at 318-20).

Lastly, but equally fatal to Koons Buick's argument is the fact that the jury, after being properly instructed on the law, rejected Koons Buick's claim that the Buyer's Order provided a basis for RISC II's Silencer charge. We do not speculate as to the substance of a jury's factual determination, and only inquire whether sufficient evidence supported the verdict.

The verdict form read as follows:

> Do you find that Koons violated the Truth in Lending Act by intentionally including a charge for a "Silencer" on the Retail Installment Sales Contract signed on February 25, 2000 with knowledge that there was *no basis* for the charge?

(J.A. at 763) (emphasis added). The jury answered "Yes." *Id.* Having evaluated the exhibits and the testimony, the jury decided that the *apparent* congruity between the Buyer's Order and RISC II did not constitute a basis for RISC II's Silencer line-item. The jury's conclusion that there was no basis, from the Buyer's Order or any other document, for RISC II's Silencer line-item could well have been based on a determination that some portion of the transaction documents were unreliable, a determination supported by the record's disclosure that Nigh executed no "we owe" form for the Silencer and that HAFC noticed this unusual absence, *see* J.A. at 769, and by Mr. Nigh's testimony that he never noticed a charge for the Silencer when he signed the second Buyer's Order and RISC II, *see* J.A. at 479-82. The jury's finding of liability was sufficiently supported by this evidence.

Koons Buick's last challenge to the TILA judgment involves the court's application of the statutory damages cap that 15 U.S.C. § 1640(a)(2)(A) establishes for TILA liability. Koons Buick contends that the court erred in allowing statutory damages of twice the finance charge in connection with the transaction, citing *Mars* v. *Spartanburg Chrysler Plymouth*, 713 F.2d 65 (4th Cir. 1983) (summarily interpreting § 1640(a)(2)(A) to cap TILA statutory damages in all individual actions at $1,000). Koons Buick's reliance on *Mars* is misplaced.

In 1983, when *Mars* was decided, the act read as follows:

> (a) . . . any [TILA violator] is liable to such person in an amount equal to the sum of —
>
>     . . . .
>
>     (2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, *or* (ii) in the case of an individual action relating to a consumer lease under part E of this subchapter, 25 per

centum of the total amount of monthly payments under the lease, except that the liability *under this subparagraph* shall not be less than $100 nor greater than $1,000[.]

§ 1640(a)(2)(A) (1980) (emphasis added). In 1995, however, Congress amended the act to read as follows:

(a) . . . any [TILA violator] is liable to such person in an amount equal to the sum of —

. . . .

(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, (ii) in the case of an individual action relating to a consumer lease under part E of this subchapter, 25 per centum of the total amount of monthly payments under the lease, except that the liability under this subparagraph shall not be less than $100 nor greater than $1,000*, or (iii)* in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling*, not less than $200 or greater than $2,000*[.]

§ 1640(a)(2)(A) (1995) (emphasis added).

The *Mars* decision plausibly interpreted the phrase "under this subparagraph" to apply to the whole of subparagraph (A) in 1983. But the 1995 amendment, by striking the "or" preceding (ii), and inserting (iii) after the "under this subparagraph" phrase, rendered *Mars'* interpretation defunct. Whereas in 1983 it was plausible to interpret the maximum and minimum provision as coming at the end of subparagraph (A), and not exclusively within subparagraph (ii), the new provision clearly places that clause wholly within (ii). Of even greater importance, the provision now expressly sets a statutory maximum and minimum in subparagraph (iii) that is different from that provided in the pre-existing maximum and minimum clause. The inclusion of the new maximum and minimum in (iii) shows that the clause previously interpreted to apply to all of (A), can no longer apply to (A),

but must now apply solely to (ii), so as not to render meaningless the maximum and minimum articulated in (iii). As a consequence of the 1995 amendment, the damages that may be awarded under subparagraph (i) are now simply "twice the amount of any finance charge *in connection with the transaction*," and the court's instruction that if Koons Buick violated TILA Nigh was "entitled to twice the [entire] finance charge" was proper.

Judge Gregory's disagreement with this analysis is founded on the mistaken conclusion that we must conclude that Congress abrogated *Mars* in order to reach our decision here. *See post* at 17-18. Of course, when a statute has been amended we interpret the new statute, not the old, and any prior opinion interpreting the old statute is necessarily brought before us for review so that we may ascertain whether the logic of that prior interpretation still applies to the new statutory language. Our responsibility is thus not to determine whether there is evidence that "Congress intended to override the Fourth Circuit's" precedent (or any circuit precedent for that matter), as Judge Gregory believes. *See post* at 18. The questions before this court, and that which we address above, are simply whether Congress amended the statute in a way relevant to the prior interpretation, and if it did, what does the amended statute mean.

Furthermore, though Judge Gregory thinks our analysis necessarily implies that Congress "changed the meaning of the word 'subparagraph,'" *see post* at 19, it does no such thing. As explained above, Congress' amendment requires that the reference point of the "under this subparagraph" clause be the subparagraph of § 1640(a)(2)(A)(ii), and not the subparagraph of § 1640(a)(2)(A). Indeed, it is Judge Gregory who would have this court change the meaning of the term "subparagraph," as his analysis would ignore the plain reading of that term and instead conclude that it was either meant in the plural, thus referencing subparagraphs (i) and (ii), or that it was a term of art not referencing a distinct subparagraph at all.

Judge Gregory's conclusion that our reading of the "under this subparagraph" clause creates surplusage in the statute's construction and "inconsistency" among its parts is equally flawed. *See post* at 19. Indeed, if the "under this subparagraph" clause had been omitted from the amended statute, Judge Gregory would have a much better case

for his interpretation. Had that occurred, he could argue that Congress intended the maximum and minimum codified in (ii) to apply to both (i) and (ii), using a comma preceding the maximum and minimum to set it off from (ii) and to show its applicability to (i) and (ii), and not using language that requires identifying a distinct subparagraph to which to apply the maximum and minimum. Thus, rather than being surplusage, the inclusion of the "under this subparagraph" clause not only enables, but actually compels, the reading we give the statute by applying the maximum and minimum limits to a distinct subparagraph.

Nor does the clause create "inconsistency" among the statute's parts either. Just because Congress did not use the same terminology to restrict the maximum and minimum in (iii) to that subparagraph as it did to restrict the maximum and minimum in (ii) to that subparagraph, it does not follow that "Congress must have meant the statutory caps . . . to have different applications," *see post* at 20. That fact leads only to the conclusion that the plain language of each must be interpreted individually to ascertain its meaning.

It could well be, as Judge Gregory concludes, that Congress did not intend to alter the statutory cap applicable under subparagraph (A)(i) when it amended the statute in 1995. However, the critical point of law — and it is critical— is that we do not know what Congress intended; all that we have before us is the amended statute from which to determine intent. And, based upon that statute, the far better, and indeed compelled, interpretation is that Congress did alter the statutory cap regardless of its intent. It is the statute, not any inferential intent, that constitutes the law. Of course, it goes without saying, if Congress enacted into law something different from what it intended, then it can simply amend the statute to bring the statute in line with congressional intent. In this way, and in this way only, are the constitutional roles of the legislature and the courts respected.

Koons Buick's last substantive attack on the district court's rulings involves the grant of summary judgment on its counterclaims. The dealership argues that the court erred by reversing, post-trial, its pre-trial grant of summary judgment with respect to installment payments owed by Nigh under RISC III. But the court did not err in this regard, because it did not reverse itself. As the court made clear, the Supple-

mented and Final Judgment, filed after trial, did not change the court's pre-trial holding; it simply "clarifie[d]" it (J.A. at 894). Admittedly, in granting summary judgment on the counterclaims, the court held that Nigh breached his contractual obligations in three ways: 1) failing to pay off the excess loan balance on his trade-in, which exceeded his estimate; 2) failing to pay on the $2,000 Promissory Note; and 3) failing to make installment payments. But the court calculated damages *to Koons Buick* only for the first two. It found Koons Buick entitled to $1,959.73 for the excess pay-off amount, and $2,000.00 for the Promissory Note. The court *never* said Koons Buick was entitled to the installment payments Nigh failed to make to HAFC; it never calculated damages to Koons Buick from this breach; and it never concluded that Koons Buick was entitled to any award for it.

Koons Buick, meanwhile, asserts it is entitled to the $30,000 due under RISC III since the court found that Nigh breached his installment payment obligations, even though it sold those rights to HAFC and HAFC repossessed the Blazer upon Nigh's breach. The dealership argues it is entitled to damages for the breach because it was the *assignor* of the sales contract. *See Carozza* v. *Boxley*, 203 F. 673, 677 (4th Cir. 1913) (noting that either an assignor or an assignee can sue on a defaulted contract). It further argues that even if it may not recover under *Carozza*, it may recover on HAFC's rights in order to preclude its own liability under Va. Code § 8.01-13, which allows assignees to recover against assignors of defaulted writings.

Both contentions fail. Koons Buick's counterclaim pleading *nowhere* refers to either installment payments or its status as an assignor. *See* Koons Buick's Answer and Counterclaim (J.A. at 63). Thus, Koons Buick did not put Nigh or the court on notice that it was suing on the installment payments, or under any assignment based theory, as would have been required for it to recover on the breach. *See* Fed. R. Civ. P. 8; *Labram* v. *Havel*, 43 F.3d 918, 920 (4th Cir. 1995) (a "pleaded claim [must] afford the opposing party fair notice of the nature and basis or grounds of the claim and a general indication of the type of litigation involved") (citations omitted)). Though the court found that Nigh breached his RISC III payment obligations, it made no award on this basis to Koons Buick, and Koons Buick,

having failed to plead on this basis, was due no award. The Supplemented and Final Judgment properly clarified this point.

Koons Buick also appeals the VCPA judgment. That judgment, however, was supported by properly admitted evidence and was sufficient to establish that Koons Buick made material misrepresentations to Nigh. These misrepresentations were intended to deceive, did deceive, and caused loss; and the jury's verdict may not be set aside. Koons Buick lastly challenges the district court's rulings on both parties' motions for costs and attorney fees. Its objections are without merit; the court did not abuse its discretion in reaching cost and fee determinations.

## B.

Nigh contends on his cross-appeal that the district court erred in granting summary judgment to Koons Buick on two claims. First, he argues that the court should have allowed him to proceed to trial on his TILA claims involving RISC III. Nigh submits that since RISC III, though signed on March 5, was back-dated to February 25, it resulted in interest being accrued as of February 25, and thus necessitated that TILA disclosures also be given as of that date. Since Nigh did not receive the disclosure documents for RISC III until March 5, he reasons that Koons Buick violated TILA and did not deserve summary judgment on the claim. Nigh's argument, though superficially clever, is without merit. While he was liable for monies *calculated* from February 25 on, he did not *become liable* for, those monies until March 5, by which point he had received the material disclosures. As Nigh himself points out, "TILA required Koons to provide Nigh with [the] disclosures . . . prior to the consummation of the transaction," Appellee's Br. at 44, and "the parties did not sign [RISC III] until March 5, 2000," *id.* at 46.[3]

---

[3]Because Nigh only argued on appeal that the back-dating of RISC III caused its accompanying disclosures to be untimely, we do not properly have before us the related question, addressed by the district court in *Rucker* v. *Sheehy Alexandria, Inc.*, 2002 WL 31355142 (E.D. Va. Oct. 16, 2002), of whether such back-dating might affect the accuracy of the accompanying disclosures.

Nigh also argues that the court erred by rejecting his claim to be entitled to rescission under Va. Code § 46.2-1542 as a result of Koons Buick's allegedly untimely transfer of title. Though Nigh was given a temporary ownership certificate governed by § 46.2-1542 upon signing RISC I, Nigh and Koons Buick executed a reassignment of title within thirty days, validly transferring title before the statutory deadline and depriving Nigh of a claim to rescission. *See* J.A. at 778 (DMV records establishing that the title transfer date for the Blazer was February 25, 2000).

## CONCLUSION

The judgment of the district court is affirmed.

*AFFIRMED*

WILLIAMS, Circuit Judge, concurring in part and concurring in the judgment in part:

I concur in sections II and III.B of the majority opinion. I concur in section III.A of the majority opinion with the exception of that part of the majority opinion analyzing the issue of whether RISC II was inaccurate, *see ante* at 7-9. I agree that "Koons Buick waived the legal argument that the congruence between the Buyer's Order and RISC II proves that RISC II accurately disclosed the transaction," *ante* at 7, and thus, I concur in the judgment as to this part and would not reach the analysis of this issue.

GREGORY, Circuit Judge, concurring in part and dissenting in part:

## I.

I write separately to dissent solely from the Court's reading of 15 U.S.C. § 1640(a)(2)(A)(1998). I would find that Congress, with the 1995 amendments to TILA, did not change the application of the $1,000 cap in § 1640(a)(2)(A)(ii). Because the cap still applies to (2)(A)(i), I would find that the district court erred in granting Nigh damages in excess of that statutory limit.

## II.

On appeal, Koons argues that the district court improperly instructed the jury on the measure of damages for Nigh's claim under TILA. The district court informed the jury that, pursuant to TILA, damages were to be equal to "twice the amount of any finance charge in connection with the transaction." § 1640(a)(2)(A)(i); J.A. at 764. Based on this instruction, the jury awarded Nigh $24,192.80 on his TILA claim. Koons insists that the $1,000 statutory cap in § 1640(a)(2)(A)(ii) applies to the calculation of damages under (2)(A)(i), and that the district judge should have reduced the award accordingly.

Before the 1995 amendments to TILA, 15 U.S.C. § 1640(a) read, in pertinent part, as follows:

> Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part . . . with respect to any person is liable to such person in an amount equal to the sum of— . . .

> (2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, or (ii) in the case of an individual action relating to a consumer lease under part E of this subchapter, 25 per centum of the total monthly payments under the lease, except that the liability *under this subparagraph* shall not be less than $100 nor greater than $1000; or

> (B) in the case of a class action, such amount as the court may allow, except that . . . the total recovery *under this subparagraph* . . . shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the creditor . . . .

15 U.S.C. § 1640(a)(1994) (emphasis added). That is, subparagraph (A) concluded with the qualification that "liability under this subparagraph shall not be less than $100 nor greater than $1,000." Both parties concede — and it is Fourth Circuit law — that this limitation applied to the entire subparagraph, both subsections (2)(A)(i) and

(2)(A)(ii). *See Mars v. Spartanburg Chrysler Plymouth*, 713 F.2d 65, 67 (4th Cir. 1983). *See also Strange v. Monogram Credit Card Bank of Ga.*, 129 F.3d 943, 947 (7th Cir. 1997) (citing *Mars*).

This reading of the statute was buttressed by the use of the same "under this subparagraph" language in § 1640(a)(2)(B), which stated (and still states), "[T]he total recovery *under this subparagraph* . . . shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the creditor." (Emphasis added). The plain reading of the pre-1995 statute was that there was one statutory cap on damages under subparagraph (B) and a separate cap under subparagraph (A). The use of the phrase "under this subparagraph" in relation to both limits made it clear that the caps were applicable to the whole of their respective subparagraphs. This was the reading of the statute adopted by the *Mars* Court, and it is an interpretation by which this panel is still bound.

In 1995, however, Congress amended the statute to add (2)(A)(iii), relating to real-estate transactions. The current statute reads, in relevant part:

> (2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, (ii) in the case of an individual action relating to a consumer lease under part E of this subchapter, 25 per centum of the total monthly payments under the lease, except that the liability *under this subparagraph* shall not be less than $100 nor greater than $1000, or (iii) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $200 or greater than $2000 . . . .

15 U.S.C. § 1640 (1998) (emphasis added). The 1995 amendments did not include any wholesale changes to the statute; the newly drafted third clause was simply tacked on to the end of the subparagraph. Still, with the addition of (2)(A)(iii), the phrase "under this subparagraph" cannot apply to all of (2)(A) as Congress initially intended, because it does not apply to (iii), which has its own cap of $2,000. Thus, the question before this Court is whether Congress meant to change the application of the statutory cap, and thus abro-

gate *Mars v. Spartanburg Chrysler Plymouth* by adding (2)(A)(iii) to the statute.[1]

I would find that *Mars* is still good law because there is no evidence that Congress intended to override the Fourth Circuit's longstanding application of the $1,000 cap to both (2)(A)(i) and (2)(A)(ii). The Seventh Circuit, the only Circuit outside of our own to interpret the amended statute, has explained:

> One could argue that § 1640(a)(2)(A)(i) and (ii) are separate "subparagraphs," and that "liability under this subparagraph" means only liability under § 1640(a)(2)(A)(ii). Although that reading has a certain appeal . . . *the history of this part of the statute suggests that such a reading has its own problems*. Until 1995, § 1640(a)(2)(A) had only two subsections, the present (i) and (ii). *Courts uniformly interpreted the final clause, which established the $100 minimum and the $1,000 maximum, as applying to both (A)(i) and (A)(ii).*

*Strange*, 129 F.3d at 947 (emphasis added).[2]

---

[1]The majority claims that its holding is supportable without concluding that *Mars* has been abrogated because the 1995 amendments present this Court with a "new statute" that was not before the *Mars* Court in 1983. *Ante*, at 11. The Court explains, "The *Mars* decision *plausibly* interpreted the phrase 'under this subparagraph to apply to the whole of subparagraph (A) in 1983. But the 1995 amendment . . . rendered *Mars*' interpretation defunct." *Ante*, at 10 (emphasis added). As a preliminary matter, I have trouble understanding the material distinction between a congressional act that renders a court's interpretation defunct and an act that abrogates that same interpretation. Regardless, the amendments do not create a new statute, but simply append a third clause to the original law. Thus, to reach its result the majority must either: (1) overrule *Mars* (which it cannot do); or (2) find that *Mars* has been abrogated. The majority effectively recognizes this fact when it states that the "prior [*Mars*] opinion . . . is necessarily brought before us for review so that we may ascertain whether the logic of that prior interpretation still applies. . . ." *Ante*, at 11.

[2]Similarly, one scholar has observed:

> [Congress] added the real estate limitation without changing the word "subparagraph." That lapse should not lead to a restriction

Disregarding the Seventh Circuit's well-reasoned analysis, the majority elects to create a circuit split, reasoning that the addition of (2)(A)(iii) has changed the meaning of the word "subparagraph" in (2)(A)(ii). Finding that a new reading of "subparagraph" is necessary, the majority states, "The inclusion of the new maximum and minimum in (iii) shows that the clause previously interpreted to apply to all of (A), can no longer apply to (A), but must now apply solely to (ii), so as not to render meaningless the maximum and minimum articulated in (iii)." *Ante*, at 10-11.

If the $1,000 cap was intended to apply only to (ii), however, then the inclusion of the phrase "under this subparagraph" would be superfluous; the meaning of (ii) would be unchanged by its deletion. It is, of course, a well-recognized rule of statutory construction that courts should "avoid a reading [of a statute] which renders some words altogether redundant." *Lane v. United States*, 286 F.3d 723, 731 (4th Cir. 2002) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 574 (1995)). Therefore, a reading of § 1640 making the phrase "under this subparagraph" meaningless should be disfavored.

Even more, to limit the $1,000 cap only to (2)(A)(ii) would create an inconsistency within the statute. The $2,000 cap in (2)(A)(iii) applies only to that individual clause, even though there is no phrase limiting its effect to one "subparagraph." If Congress also intended to limit the reach of the statutory cap in (ii), then it would have either deleted the words, "under this subparagraph" from (ii), or included the phrase in both (ii) and (iii). By declaring that the statutory cap in (ii) should apply to claims "under this subparagraph," but not similarly

of liability solely as to part (ii) because that would be a significant change that would require the word "subparagraph" to be applied only to part (ii), when that has always been applied to everything included in subparagraph (A).

Elwin Griffith, *Searching for Truth in Lending: Identifying Some Problems in the Truth in Lending Act and Regulation Z*, 52 Baylor L. Rev. 265, 305 (2000). As a result, Professor Griffith concluded, "Congress did not change its mind about the meaning of that word, but instead neglected to make the necessary adjustment when it added a third part to accommodate transactions secured by real estate." *Id.*

qualifying the cap in (iii), Congress must have meant the statutory caps in those two clauses to have different applications.

This reading is made even more compelling when one considers that the phrase "under this subparagraph" in § 1640(a)(2)(B) indisputably applies to all of subparagraph (B). Similarly, the statutory cap following (2)(A)(ii) applies to all claims under subparagraph (A), with the exception of claims under (2)(A)(iii), which contains its own, discrete limit. In short, the most logical interpretation of the statute is to read the phrase "under this subparagraph" as applying generally to an entire subparagraph, either (A) or (B), and to read (2)(A)(iii) as creating a specific carve-out from that general rule for real-estate transactions.

This is the reading that has been adopted by the Seventh Circuit:

> [T]he 1995 amendment was designed simply to establish a more generous minimum and maximum for certain secured transactions, without changing the general rule on minimum and maximum damage awards for the other two parts of § 1640(a)(2)(A). We therefore conclude that the "subparagraph" mentioned in § 1640(a)(2)(A)(ii) continues to encompass what is now codified as subparts (A)(i) and (A)(ii), and not just subpart (A)(ii).

*Strange*, 129 F.3d 943, 947 (7th Cir. 1997). When Congress added § 1640(a)(2)(A)(iii), it included a $2,000 cap specifically for (iii), but left the older $1,000 cap unchanged. The qualifier, "under this subparagraph," remained. Thus, I would hold that the addition of (2)(A)(iii) did not alter the meaning of (2)(A)(i) or (2)(A)(ii). To hold otherwise would be to dramatically increase creditors' liability exposure under § 1640(a)(2)(A), without any explicit, statutory language to support such an increase.

III.

In sum, I concur with the majority's assessment that Koons engaged in a variety of scurrilous business practices that support the jury's finding of liability under both TILA and the VCPA. However,

for the reasons articulated above, I believe that Koons' statutory liability for its TILA violation is capped at $1,000. Accordingly, I dissent in part from the majority's judgment.